UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VICTORIA POMPEY                                           CA NO. 04-3357


        VERSUS                                            JUDGE BARBIER


IMMUNEX CORPORATION, ET AL                                MAG. JUDGE ROBY




MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
IMMUNEX CORPORATION AND AMGEN INC.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................3

    I.    The Parties and Plaintiff's Claims ...........................................................3

    II.    Enbrel® ......................................................................................................3

    III.    Plaintiff's Medical Chronology .................................................................5

    IV.    There is No Evidence that Enbrel® Caused Pompey's Optic Neuritis ........8

LEGAL STANDARD...........................................................................................11

ARGUMENT .......................................................................................................11

    I.    The Immunex Defendants are Entitled to Summary Judgment Because Pompey Cannot Demonstrate that Enbrel® Caused Her Optic Neuritis ..................................................................................................11

        A.    Proof of Causation is Required for All of Pompey's Claims ...........11

        B.    The Uncontroverted Evidence Demonstrates That Enbrel® Did Not Cause Pompey's Optic Neuritis...........................................13

        C.    Plaintiff's Medical History Illustrates Other Potential Causes of Her Optic Neuritis .......................................................................15

    II.    The Immunex Defendants Are Entitled to Summary Judgment Because The Learned-Intermediary Doctrine Bars All of Pompey's Claims...........................................................................................16

    III.    Summary Judgment is Warranted Because Pompey's Claims are Preempted ..........................................................................................20

        A.    Preemption Generally .....................................................................20

        B.    FDA Regulatory Scheme .................................................................21

        C.    FDA Mandated the Demyelination Warning Language For Enbrel® ..................................................................................23

           1. Enbrel®'s Package Insert ...........................................................23

           2. "Dear Doctor" Letter ..................................................................24

        D.    Plaintiff's Claims are Preempted .....................................................25

CONCLUSION....................................................................................................28

CERTIFICATE OF SERVICE ............................................................................29

1072188-1

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>:

<u>Abramowitz v. Cephalon, Inc.</u>, 2006 WL 560639 (N.J. Super. L. Mar. 3, 2006) ................27

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) ........................................11

<u>Brock v. Merrell Dow Pharma., Inc.</u>, 874 F.2d 307 (5th Cir. 1989).......................14

<u>Brown v. Parker-Hannifin Corp.</u>, 919 F.2d 308 (5th Cir. 1990)............................12

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) ...............................................11

<u>Chavers v. Travis</u>, 902 So. 2d 389 (La. App. 2005) ........................................12

<u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504 (1992) ...................................20

<u>Colacicco v. Apotex, Inc.</u>, 432 F.Supp.2d 514 (E.D. Pa. 2006).........................27

<u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363 (2000) .............................20

<u>Dusek v. Pfizer Inc.</u>, No. Civ. A. H-02-3559, 2004 WL 2191804
    (S.D. Tex. Feb 20, 2004)..............................................................27

<u>Ehlis v. Shire Richwood, Inc.</u>, 233 F. Supp. 2d 1189 (D. N. Dak. 2002),
    <u>aff'd</u> 367 F.3d 1013 (8th Cir. 2004)..........................................22, 27

<u>English v. General Elec. Co.</u>, 496 U.S. 72 (1990) ...........................................20

<u>Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141 (1982) ................20

<u>George v. Housing Authority of New Orleans</u>, 906 So. 2d 1282 (La. App.
    4 Cir. 2005) ...........................................................................12

<u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861 (2000)........................................20

<u>Hurley v. Lederle Labs.</u>, 863 F.2d 1173 (5th Cir. 1988) .................................26, 28

<u>Hutchinson v. Shah</u>, 648 So. 2d 451 (La. App. 1994) .......................................13

<u>IMC Exploration Co. v. Henderson</u>, 419 So. 2d 490 (La. App. 2 Cir.),
    <u>writ denied</u>, 423 So. 2d 1149 (La. 1982) ......................................12

<u>In re: Bextra and Celebrex Marketing Sales Practices and Prod. Liab.</u>
    <u>Litig.</u>, No. 05-1699 CRB (N.D. Cal. Aug. 16, 2006).........................27

<u>Int'l Paper Co. v. Ouellette</u>, 479 U.S. 481 (1987) ...........................................20

1072188-1

## TABLE OF AUTHORITIES- continued

**Page**

**Cases**

Jones v. Rath Packing Co., 430 U.S. 519 (1977).....................................................20

Lasha v. Olin Corp., 625 So. 2d 1002 (La. 1993).................................................13

Maurer v. Heyer-Schulte Corp., 2002 WL 31819160 (E.D. La. 2002) ................................11, 14

McCarthy v. Danek Med., Inc., 65 F. Supp. 2d 410 (E.D. La. 1999).....................................16

Mikell v. Hoffman-La Roche, Inc., 649 So. 2d 75 (La. App. 1994).......................................16

Moody v. Blanchard Place Apartments, A 793 So. 2d 281 (La. App. 2001) ........................12

Needleman v. Pfizer Inc., No. Civ. A. 3:03-CV-3074-N, 2004 WL 1773697
   (N.D. Tex. Aug. 6, 2004) ........................................................................27

Norris v. Bell Helicopter Textron, 499 So. 2d 85 (La. 1987) ................................................12

Parra v. Pirelli Tire, L.L.C., No. Civ. A. 98-3727, 1999 WL 796213
   (E.D. La. Oct. 1, 1999)........................................................................11

Premo Pharm. Lab., Inc. v. United States, 629 F.2d 795 (2nd Cir. 1980)..............................21, 26

R.F. v. Abbott Labs., 745 A.2d 1174 (N.J. 2000)................................................................27

Stahl v. Novartis Pharms. Corp., 283 F.3d 254 (5th Cir.),  cert. denied,
   123 S. Ct. 111 (2002)........................................................................12, 16, 17, 18

Todd v. State of Louisiana, 699 So. 2d 35 (La. 1997)......................................12

Weber v. Fidelity & Casualty Ins. Co. of New York, 250 So. 2d 754
   (La. 1971).........................................................................................12

Wheat v. Pfizer, Inc., 31 F.3d 340 (5th Cir. 1994) ..........................................12, 15

Willet v. Baxter Int'l, Inc., 929 F.2d 1094 (5th Cir. 1991)....................................17, 18, 19

**Statutes**

La. Rev. Stat. § 9:2800.52.........................................................................3

La. Rev. Stat. § 9:2800.54(A) .....................................................................12

La. Rev. Stat. § 9:2800.54(B) .....................................................................3

## TABLE OF AUTHORITIES- continued

### Statutes                                                                      Page

La. Rev. Stat. § 9:2800.55.................................................................................15

La. Rev. Stat. § 9:2800.56.................................................................................15

La. Rev. Stat. § 9:2800.57.................................................................................16

La. Rev. Stat. § 9:2800.57(A)...........................................................................16

U.S.C.A. Const. Art. VI, cl.2...........................................................................20

21 U.S.C. § 301 et seq......................................................................................20

21 U.S.C. § 352(a)...........................................................................................22

21 U.S.C. § 355(a)...........................................................................................21

 42 U.S.C. § 262(a)(2)(B)(i)(I).........................................................................21

### Regulations

21 C.F.R. § 10.85(d)(1)....................................................................................23

21 C.F.R. § 5.10(a)(1) .....................................................................................21

21 C.F.R. § 5.10(a)(3) .....................................................................................21

21 C.F.R. § 201.56...........................................................................................21

21 C.F.R. § 201.57...........................................................................................21

21 C.F.R. § 201.59...........................................................................................21, 22

21 C.F.R. § 201.100(d)(1)................................................................................22

21 C.F.R. § 314.70(c)(2)..................................................................................22

21 C.F.R. § 600.80...........................................................................................21

21 C.F.R. § 601.2.............................................................................................21

21 C.F.R. § 601.20...........................................................................................21

21 C.F.R. § 601.5(b)(1)(vi)..............................................................................21

## <u>TABLE OF AUTHORITIES</u>- continued

**<u>Page</u>**

<u>Rules</u>

Fed. R. Civ. P. 56(c) ..........................................................................................................11


<u>Other Authorities</u>

<u>Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products,</u> 71 Fed. Reg. 3922 (Jan. 24, 2006) ..................................................................22

Defendants, Immunex Corporation and Amgen Inc. (collectively the "Immunex Defendants"), pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Victoria Pompey was prescribed the biological product Enbrel® to combat her symptoms of psoriatic arthritis and psoriasis. She claims to have developed optic neuritis — a condition in which the optic nerve[1] becomes inflamed — as a result of using Enbrel®, and she asserts claims of design, composition or construction defect and failure to warn. Her claims fail, however, for three reasons: (1) there is no competent evidence of causation; (2) her failure to warn claim is barred by the learned intermediary doctrine; and (3) her claims are impliedly-preempted by the federal regulations governing biological products.

First, there can be no dispute that plaintiff is required by Louisiana law to produce evidence of causation in support of her claims in this product liability lawsuit. And, as shown in detail below, there is no dispute that she has not – and cannot – come forward with competent evidence that Enbrel® caused her to develop optic neuritis. This is not surprising because there are no peer-reviewed medical literature or empirical data supporting the existence of a causal link between Enbrel® and optic neuritis. Further, plaintiff's medical history points to another possible cause of her optic neuritis. Because plaintiff has not, and cannot, establish the requisite causal link between Enbrel® and optic neuritis, this Court should enter summary judgment in favor of the Immunex Defendants.

Second, summary judgment is further warranted on plaintiff's failure to warn claim based upon the learned intermediary doctrine because the package insert for Enbrel® specifically warns that demyelinating disorders, including optic neuritis, are potential adverse reactions about

---

[1]   The optic nerve connects the eye to the brain.

- 1 -

which there have been rare reports.  The language in the package insert clearly warned the prescribing physician of these potential risks and, as discussed below, is adequate as a matter of law.  Indeed, plaintiff's prescribing physician testified <u>that</u>:  (1) she knew that there were rare reports of demyelinating disorders, such as optic neuritis, associated with Enbrel® when she prescribed it to the plaintiff; (2) the package insert adequately informed her of the potential association of Enbrel® and optic neuritis; (3) notwithstanding her knowledge of this potential association, she made the informed medical decision to prescribe Enbrel® to the plaintiff; and (4) even knowing plaintiff's outcome, she still believes it was an appropriate medical decision to prescribe Enbrel®, and she continues to prescribe the biologic today.

<u>Finally</u>, plaintiff's claims are preempted by the federal regulations governing prescription products such as Enbrel®.  The Food and Drug Administration ("FDA") is exclusively responsible for reviewing and approving applications to sell a drug or biological product in the United States, and that agency administers a complex and demanding regulatory process for review and approval of such applications.  In essence, plaintiff's Petition seeks a second opinion about Enbrel®'s safety and effectiveness, this time from a lay jury rather than from the expert agency Congress exclusively charged with reviewing a biological product's safety.  Her tort claims are conflict-preempted because, if permitted, they would unduly impede FDA's authority to approve biological products as safe and effective for use.  Particularly in circumstances like this, where FDA has specifically reviewed, proposed changes to, and approved warning language <u>for the very adverse effect</u> which plaintiff <u>subsequently</u> sustained, allowing state tort claims to go forward would completely undermine FDA's role.  Summary judgment is thus appropriate.

1072188-1

## STATEMENT OF UNDISPUTED FACTS

I.   **The Parties and Plaintiff's Claims**

Plaintiff Victoria Pompey ("Plaintiff") was prescribed Enbrel® to treat her arthritis and psoriasis. See Deposition Transcript of Dr. Erin Boh ("Boh Depo. Trans.") at 23:3-23 (Ex. 1). The Immunex Defendants manufacture Enbrel®, and co-market the biologic with co-defendant Wyeth-Ayerst Laboratories ("Wyeth"). Petition ¶ 1. The Immunex Defendants earlier filed a Motion to Dismiss, arguing that dismissal was appropriate because the sole causes of action plead therein were barred by the Louisiana Products Liability Act ("LPLA"), La. Rev. Stat. § 9:2800.52. As the Immunex Defendants pointed out, the LPLA provides four exclusive theories of liability upon which a plaintiff can base a claim: (1) defect in construction, (2) defect in design, (3) inadequate warning, and (4) breach of express warranty. La. Rev. Stat. § 9:2800.54(B). The LPLA does not permit a cause of action that sounds in negligence such as those originally plead by the plaintiff.

This Court granted the Immunex Defendants' Motion to Dismiss, in part, but held that "Plaintiff has sufficiently alleged that the product has a design, construction or composition defect [as permitted under the LPLA]." See Order at 4. It also held that "the Petition sufficiently alleges that the product had an inadequate warning at the time it was prescribed to Plaintiff." Only these claims remain in this case.

II.  **Enbrel®**

The product at issue is the biologic Enbrel®, which is a prescription biologic product approved by the United States Food and Drug Administration ("FDA") in November 1998 for the treatment of rheumatoid arthritis. See Rheumatoid Arthritis Approval Letter (Ex. 2). Following this approval, FDA subsequently approved Enbrel® as safe and effective for use in

-3-

several other patient populations, including psoriatic arthritis and psoriasis. [2] See Psoriatic

Arthritis Approval Letter (Ex. 3); Psoriasis Approval Letter (Ex. 4).

   Since its initial approval, the Immunex Defendants have obtained additional safety

information and have worked with FDA to ensure that healthcare professionals obtain this

information through revisions to the Enbrel® package insert, and, when necessary, "Dear

Healthcare Professional" Letters. See infra at 23-25.   For example, in May 2000, Immunex,

Wyeth, and FDA received a few post-marketing reports of patients with central nervous system

conditions associated with demyelination—the erosion of the myelin sheath around the nerve

fibers.   See 2001 Briefing Document at 13 (Ex. 5).   Immunex and Wyeth representatives

informed FDA of the rare reports and worked with the agency to incorporate into the Enbrel®

package insert a warning for neurologic events.   In August 2000, Immunex and Wyeth updated

Enbrel®'s package insert to describe the rare cases of central nervous system demyelinating

diseases, which advised doctors to perform a careful risk/benefit analysis in patients with

preexisting or recent onset of such disorders before prescribing Enbrel®. Id. at 10.

   On October 10, 2000, a "Dear Doctor" letter was issued, notifying practitioners of these

rare adverse events and labeling changes.   See Dear Healthcare Professional Letter (Ex. 6).   This

letter was drafted in consultation with and approved by FDA, and reported, among other things,

that:

---

[2] Tumor necrosis factor ("TNF") is a chemical messenger that helps regulate the inflammatory process.
During a normal immune response, TNF attaches to special cells throughout the body, and activates
immune cells.  This activation causes immune cells to release chemicals that can contribute to
inflammation.  In patients with psoriasis, such as Plaintiff, excessive TNF is produced by the body, and
the body's immune system cannot adequately control inflammation in the skin, leading to the formation
of plaques.  Enbrel® is similar to a protein produced naturally by the body that can bind to some of the
excess TNF molecules and deactivate them before they trigger inflammation.  By interrupting the chain of
events that leads to inflammation, Enbrel® reduces inflammatory symptoms, and thus, improves plaques.

> **Rare cases of central nervous system disorders, including demyelinating disorders such as multiple sclerosis, myelitis, and optic neuritis**, have been reported in patients with rheumatoid arthritis who have received ENBREL therapy. **Although the causal relationship to ENBREL therapy remains unclear**, other [TNF] antagonists administered to patients with multiple sclerosis have been associated with increases in disease activity.  Prescribers should exercise caution in considering the use of ENBREL in patients with preexisting or recent-onset central nervous system demyelinating disorders.

Id. (emphasis added).  This language was also added to Enbrel®'s package insert in October of 2000, and the "Warnings" section of the package insert has contained a warning for "Neurologic Events" since that time.  Notably, the "Warnings" section of the Enbrel® package insert in effect at the time of Plaintiff's September 21, 2001 Enbrel® prescription provided:

> **Neurologic Events**
>
> Treatment with ENBREL and other agents that inhibit TNF have been associated with rare cases of new onset or exacerbation of central nervous system demyelinating disorders, some presenting with mental status changes and some associated with permanent disability.  **Cases of transverse myelitis, optic neuritis, and new onset or exacerbation of seizure disorders have been observed in association with ENBREL therapy.  The causal relationship to ENBREL therapy remains unclear.**  While no clinical trials have been performed evaluating ENBREL therapy in patients with multiple sclerosis, other TNF antagonists administered to patients with multiple sclerosis have been associated with increases in disease activity.  Prescribers should exercise caution in considering the use of ENBREL in patients with preexisting or recent-onset central nervous system demyelinating disorders.

See Package Insert at 11-12 (Ex. 7) (emphasis added).  Notwithstanding the rare reports of demyelinating conditions such as optic neuritis – the injury alleged here – and the inclusion of a warning regarding such rare reports in the Enbrel® package insert, no causal connection has ever been established between Enbrel® and any demeylinating disorders. Id.; see also infra at 8-11.

## III.    **Plaintiff's Medical Chronology**

Plaintiff's treating dermatologist, Dr. Erin Boh, was aware of Enbrel®'s warning for neurologic events, including optic neuritis, as set out in the "Dear Doctor" letter and the Enbrel®

- 5 -

package insert, when she made the informed decision to prescribe the biologic to Plaintiff to treat

her arthritis symptoms and psoriasis on September 21, 2001.  See Boh Depo. Trans. at 23:3-23;

64:6-12; 66:45-67:5 (Ex. 1).  And, Dr. Boh felt this warning provided her with the information

necessary to make the informed decision to prescribe Enbrel® to Plaintiff:

> Q:   Okay.  And do you feel that you as a prescribing physician in September
>      of 2001 had the information you needed with respect to the potential
>      adverse reactions for Enbrel to make an informed decision as to whether to
>      prescribe it to Ms. Pompey?
>
> A:   Yes.
>
> Q:   And do you believe that the warnings for neurologic events outlined in the
>      package insert which has been marked as Exhibit # 6 clearly and
>      unambiguously conveys to you the information available at that time
>      relating to these events?
>
>           *       *       *
>
> A:   Yes, I think it was adequate.

Id. at 28:13-29:5.

Dr. Boh further explained that notwithstanding her knowledge of this potential

association,[3] she made the decision to prescribe Enbrel® to Plaintiff because:

> Prior to me prescribing Enbrel, she had been treated with several other therapies
> for both her arthritis, as well as her psoriasis.  She'd been treated with
> methotrexate, which is our gold standard for treating psoriatic arthritis, as well as
> psoriasis.  She had been treated with phototherapy.  She had been treated with oral
> retinoids.  She had been treated with some other therapies that had been reported
> in the rheumatologic arena to help rheumatoid arthritis, which is Arava, that
> therapy.  When I saw her in, I think, maybe June of that year, she had been
> reporting to me that her arthritis was very symptomatic. She had difficulties with
> back pain and – low back pain, as well as arthritic complaints in the hands and
> spine.  We had looked at other options for her, and in terms of her arthritis options,

---

[3]   An important distinction exists between an "association" and "causation."  According to Dr. Boh
"there are things that may be associated with either a disease process or therapy, not necessarily causing
the disease.  Causation is different.  You look at some either etiology or some trigger event."  See Boh
Depo. Trans. at 19:11-17 (Ex. 1).  Dr. Sacks also testified that there is a distinction between an
association and causation. See Deposition Transcript of Dr. Joel Sacks ("Sacks Depo. Trans.") at 20:5-19
(Ex. 8).

there were not at that point very good options for her. In the rheumatologic data, you can use Plaquenil; however, it worsens psoriasis. So that was one of the therapies that we chose not to do. The studies had already been done with Enbrel on psoriatic arthritis; it had already been approved for rheumatoid arthritis, and the data was out there that it was very useful and efficacious in rheumatoid arthritis. Psoriatic arthritis is similar in some of its aspects.
So we thought – I thought this would be a reasonable option to try in a patient who had failed to respond to other therapies.

Id. at 22:17-23:23. Indeed, Plaintiff took Enbrel® for almost two years, and during that time, she "did well on Enbrel. Her arthritis improved. Her psoriasis improved." Id. at 30:19-20. By her October 8, 2003 visit, Plaintiff had significant improvement with her arthritis, and her psoriasis had gotten much better. Id. at 35:3-9.

A few weeks later, on October 29, 2003, Plaintiff received a vaccination for influenza. See Influenza Consent Form (Ex. 9). The influenza vaccination is commonly associated with the development of optic neuritis. See Sacks Depo. Trans. at 20:20-21:1 (Ex. 8); Declaration of Dr. Neil Miller ("Miller Decl.") at ¶ 12, Ex. C to Decl. at 327 (Exhibit 10). In fact, there are reports in the medical literature of patients developing optic neuritis three to four weeks after receiving the influenza vaccination. See Miller Decl. at ¶ 12, Ex. C to Decl. at 327 (Ex. 10); Sacks Depo. Trans. at 24:1-8 (Ex. 8).

And, on November 25, 2003, approximately three and a half weeks after Plaintiff received the influenza vaccination, she was hospitalized for decreased vision in her left eye only. See Tulane Med. Records (Bates Nos. 000160-000221) (Ex. 11). During her hospitalization, Plaintiff's differential diagnosis was "optic neuritis v. vascular event." Id. at Bates Nos. 000171-172. She was discharged on November 27, 2003, with the plan to follow up with a neuro-ophthalmologist. Id.

On December 8, 2003, Plaintiff saw Dr. Joel Sacks, a highly credentialed neuro-ophthalmologist, for evaluation of her decreased vision in her left eye. See Sacks Medical Record (Bates Numbers 000157(e)-000157(n)) (Ex. 12).   After his evaluation of Plaintiff, Dr. Sacks' initial diagnosis was "optic neuritis  OS [oculus sinister/left eye] with DDM [dependent diabetes mellitus]." See Sacks Depo. Trans. at 26:25-27:18 (Ex. 8); Sacks Med. Record (Bates No. 000157(f))) (Ex. 12).  Diabetics, such as Plaintiff, are at risk to develop both anterior and retrobulbar optic neuropathy.  See Miller Decl. at ¶ 13 (Ex. 10).  Following Dr. Sacks' next evaluation of Plaintiff on December 9, 2003, he held the opinion that "she simply has idiopathic [meaning cause unknown] retrobullar optic neuritis." [4]  See Sacks Med. Record (Bates No. 000157(o)-000157(r)) (Ex. 12).  Dr. Sacks treated Plaintiff until roughly December 4, 2004, and during that time, her visual acuity improved. See Sacks Depo. Trans. at 45:14-17 (Ex. 8).

**IV.     There is No Evidence that Enbrel® Caused Plaintiff's Optic Neuritis**

Although Plaintiff was using Enbrel® when her optic neuritis developed, the critical point is that there is no evidence that Enbrel® caused her condition.  The deposition testimony of Plaintiff's treating neuro-ophthalmologist, Dr. Sacks, shows that Plaintiff cannot prove causation:

> Q:     Doctor, are you aware of any studies in any peer-reviewed or refereed [sic] journals that have concluded or have empirically demonstrated that there is a causal connection between the drug Enbrel and optic neuritis or optic neuropathy?
>
> A:     No.
>
> Q:     You're aware of no such empirical data from any source, of a causal connection?
>
> A:     That is correct.
>
> Q:     In this case, can you say to a reasonable medical probability that Enbrel was the cause of Ms. Pompey's optic neuritis?
>
> A:     No.

---

[4]   Retrobulbar ischemic optic neuropathy is damage to the optic nerve caused by a decreased blood flow to the optic nerve. See Miller Decl. at ¶ 5 (Ex. 10).

- 8 -

> Q:     And is that – is that because there aren't studies and datas out there to
>        show – data, I mean – there are not studies to show the causal connection?
>
> A:     Yes.

<u>See</u> Sacks Depo. Trans. at 24:9-25:1 (Ex. 8).[5]

Similarly, according to Dr. Neil Miller, a Professor of Neurology, Neurosurgery, and Ophthalmology, at The Johns Hopkins School of Medicine, who authored the 4th edition of *Walsh & Hoyt's Clinical Neuro-Ophthalmology* and edited the 5th and 6th editions: "Enbrel® did not, in any way, cause damage to her optic nerve in the form of optic neuritis or any other condition in the differential diagnosis, including ischemic optic neuropathy or toxic optic neuropathy." Miller Decl. at ¶ 15 (Ex. 19). He explains the bases for his opinion as follows:

> First, my literature search revealed no scientific or medical literature
> establishing a causal connection between Enbrel® and optic nerve disease,
> including optic neuritis.   Second, the majority of cases in which a toxic
> substance, such as a pharmaceutical drug, causes damage to the optic
> nerve, tend to be bilateral, meaning the symptoms occur in both eyes.  In
> fact, according to Walsh and Hoyt's textbook, "bilaterality is the rule."
> However, in this case, Ms. Pompey experiences vision loss only in one
> eye.  A copy of the chapter addressing this issue in *Walsh & Hoyt's
> Clinical Neuro-Ophthalmology* is attached to this Declaration as Exhibit B.
> Third, Ms. Pompey received the influenza vaccination [within]
> approximately three and one half weeks of her reported vision loss, and

---

[5]   It is anticipated that in response to this Motion, Plaintiff will attempt to rely upon a note by Dr. Sacks, which suggests that Plaintiff had "optic neuritis secondary to Enbrel® toxicity." <u>See</u> <u>e.g</u> Sacks Med. Records (Bates Nos. 000700, 000706, 000709, 000714) (Ex. 12).  However, such reliance is misplaced and certainly does not sustain her burden of proof because Dr. Sacks' sworn deposition testimony demonstrates that contrary to this notation, he cannot say, to a reasonable degree of medical probability, that Enbrel® caused Plaintiff's optic neuritis. <u>See</u> Sacks Depo. Trans. at 24:9-25:1 (Ex. 8). When questioned about that notation, Dr. Sacks explained:

> A physician's responsibility is primarily for treatment.  That note was not made with the intent of
> assigning a cause in a legal situation.  I wrote that down because there was the reported
> association and to remind myself when I saw her next that there was a confounding variable that
> this may not be idiopathic optic neuritis.

<u>Id.</u> at 35:13-20.  Dr. Sacks, however, continued that "[i]t became apparent to me that I did not have adequate data to make that diagnosis." <u>Id.</u> at 39:14-15.  His unsworn note is, thus, insufficient to sustain plaintiff's burden of proof on the threshold causation issue, particular in view of his deposition testimony.

1072188-1

Case 2:04-cv-03357-CJB-KWR   Document 33-2   Filed 08/21/06   Page 16 of 35

there is a reported association between the influenza vaccination and optic neuritis. A copy of the chapter in *Walsh & Hoyt's Clinical Neuro-Ophthalmology* addressing this issue is attached to this Declaration as Exhibit C. Fourth, generally, in cases of toxic optic neuropathy, vision loss improves rapidly when the toxic agent is removed. Here, after the Enbrel® was stopped, Ms. Pompey recovered some vision but very slowly.

Id. at ¶ 16.

Dr. Boh echoed this lack of causation opinion during her deposition as she testified that "[i]n my opinion, I don't think it caused it." See Boh Depo. Trans. at 41:6 (Ex. 1). Like Dr. Sacks, Dr. Boh explained that she is not aware of "any literature that establishes a causal connection between Enbrel® and optic neuritis." Id. Dr. Boh's personal experience is consistent with the lack of scientific support of a causal relationship as she testified that Plaintiff is her only patient who has developed optic neuritis while on Enbrel® therapy. Id. at 47:22-48:1. And, she has prescribed Enbrel® to at least "several hundred" patients and continues to prescribe it today. Id. at 15:7-12; 47:16-21. In fact, Dr. Boh testified that even knowing Plaintiff's outcome, "it was an appropriate choice of medication." Id. at 48:6-7.

Enbrel® is an effective and safe treatment option for patients as Dr. Boh testified:

In terms of efficacy, it is quite efficacious, on the order – in terms of psoriatic arthritis, I'd say of my patients, at least 50, 55 percent get more than a 50 percent improvement in their arthritis symptoms.
In terms of psoriasis, I would say at least that same number in the sense that probably 55 to 60 percent of patients get at least 75 percent better. So it's a very efficacious therapy.

Id. at 16:17-17:1. And, in terms of its safety profile, Dr. Boh testified that "it falls into the category of all anti-TNF therapies, that it does have a very good safety profile when compared to therapies such as methotrexate, especially long-term therapy. So I would say as a global overview, it has a very good safety profile." Id. at 17:6-12.

- 10 -

1072188-1

## LEGAL STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party moving for summary judgment must identify the record evidence and affidavits which it believes demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  And, a party seeking to defeat summary judgment must in turn point to "specific facts showing that there is a genuine issue for trial."    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  "Summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of a nonmovant." Parra v. Pirelli Tire, L.L.C., 1999 WL 796213, at *1 (E.D. La. 1999)(citations omitted).  "[A] district court does not 'in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.'" Maurer v. Heyer-Schulte Corp., 2002 WL 31819160, at *3 (E.D. La. 2002).

## ARGUMENT

**I.    The Immunex Defendants are Entitled to Summary Judgment Because Plaintiff Cannot Demonstrate that Enbrel® Caused Her Optic Neuritis**

**A.    Proof of Causation is Required for All of Plaintiff's Claims**

Plaintiff's product liability claims for defective design, composition or construction defect and failure to warn cannot survive summary judgment because she has not, and, indeed, cannot, produce any competent evidence that Enbrel® caused her to develop optic neuritis.  It is well established that, regardless of the theory of defect, "[t]he initial element a plaintiff must establish pursuant to the Louisiana Products Liability Act (LPLA) is that there is proximate causation, that is, a link between the actions of the manufacturer and the injury causing product."

- 11 -

George v. Housing Authority of New Orleans, 906 So.2d 1282, 1286 (La. App. 4 Cir. 2005).[6]

The causation requirement necessitates proof of "not only causation in fact, but also that the product was the most probable cause of the injury." Wheat v. Pfizer, Inc., 31 F.3d 340, 342 (5th Cir. 1994) (citing Brown v. Parker-Hannifin Corp., 919 F.2d 308, 311, 312 n. 9 (5th Cir. 1990)).[7] A plaintiff's case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture. Id. (citations omitted).

Plaintiff thus has the burden of proving causation "by a preponderance of the evidence, which may be met either by direct or circumstantial evidence." Moody v. Blanchard Place Apartments, 793 So. 2d 281, 289 (La. App. 2 Cir. 2001) (citing Norris v. Bell Helicopter Textron, supra; Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So. 2d 754 (La. 1971)). Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. Id.

Furthermore, where – as here – the plaintiff alleges that his or her injuries were caused by exposure to the defendant's product, the complexity of the causation issue is beyond common experience, and expert testimony is required to establish causation. See Chavers v. Travis, 902 So.2d 389, (La. App. 2005) (explaining that expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge) (citing

---

[6] As this Court is well aware, the LPLA mandates that "a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." Stahl v. Novartis Parma. Corp., 283 F.3d 254, 260-261 (5th Cir. 2002) (citing La.Rev.Stat. Ann. § 9:2800.54(A) (West 1997)).

[7] "Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it is established with reasonable certainty that all other alternatives are impossible." Todd v. State of Louisiana, 699 So.2d 35, 43 (La. 1997) (citing IMC Exploration Co. v. Henderson, 419 So.2d 490, 509 (La. App. 2 Cir.), writ denied, 423 So. 2d 1149,1150 (La.1982), reconsideration denied, 427 So. 2d 866 (La. 1983)).

Hutchinson v. Shah, 648 So.2d 451, 452 (La. App. 1 Cir. 1994) (citing Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La. 1993)).  Clearly, the scientific nature of the causation questions involved in this case involve issues that are beyond the common experience and, therefore, require expert testimony to meet Plaintiff's burden here.

Plaintiff simply has not, and cannot, produce any causation evidence whatsoever, through expert testimony or otherwise.  The only evidence of alleged causation advanced by Plaintiff are the bare allegations in the Petition.  Such unsupported allegations of causation are clearly insufficient to overcome the entry of summary judgment where – as here – the record provides strong evidence rebutting any causation as detailed below.  And, Plaintiff's failure to produce expert testimony on causation is "fatal" to her product liability claims.

**B.**     **The Uncontroverted Evidence Demonstrates That Enbrel® Did Not Cause Plaintiff's Optic Neuritis**

Contrary to Plaintiff's unsupported allegations of causation, the uncontroverted evidence demonstrates that Enbrel® did not cause, or in any way contribute to, her optic neuritis.  The deposition testimony of Plaintiff's treating neuro-ophthalmologist, Dr. Sacks, establishes clearly that Enbrel® did not cause her optic neuritis. He testified that he cannot say "to a reasonable medical probability that Enbrel® was the cause of Pompey's optic neuritis." Sacks Depo. Trans. at 24:9-25:1 (Ex. 8)   He bases his opinion on the absence of any study or data to show the "causal connection."   Id.   Dr. Boh rendered a similar opinion, and she, too, explained that "[t]here's no data that supports causation." Boh Depo. Trans. at 45:3-6 (Ex. 1).

Similarly, one of the nation's leading neuro-ophthalmologists, Dr. Neil Miller, attests:

> It is my opinion, to a reasonable degree of medical probability, that Ms. Pompey's use of Enbrel® did not, in any way, cause damage to her optic nerve in the form of optic neuritis or any other condition in the differential diagnosis, including ischemic optic neuropathy or toxic optic neuropathy.

- 13 -

Miller Decl. at ¶ 15 (Ex. 10).  And, he bases his opinion on: (1) the lack of "scientific or medical literature establishing a causal connection between Enbrel® and optic nerve disease, including optic neuritis"; (2) "the majority of cases in which a toxic substance . . . causes damage to the optic nerve tend to be bilateral" and Plaintiff had symptoms only in one eye;  (3) Plaintiff received the influenza vaccination within "approximately three and a half weeks of her reported vision loss, and there is a reported association between the influenza vaccination and optic neuritis"; and (4) "in cases of toxic optic neuropathy, vision loss improves rapidly when the toxic agent is removed.  Here, after the Enbrel® was stopped, Plaintiff recovered some vision but very slowly."  Miller Decl. at ¶ 16 (Ex. 10).

The undisputed expert opinions of Drs. Sacks, Boh and Miller demonstrate clearly that no causal connection exists between Enbrel® and Plaintiff's optic neuritis.  It is, thus, hardly surprising that Plaintiff has not produced any evidence of causation in the form of expert testimony or otherwise.  Nor is there any reason to expect that Plaintiff will ever be able to produce admissible evidence of medical causation.  In the end, there is simply no scientific evidence to support a causal connection between Enbrel® and optic neuritis.  The lack of any scientific studies to support Plaintiff's claims is particularly detrimental to Plaintiff's claims given the Fifth Circuit's position that "the most useful and conclusive type of evidence in a case such as this is epidemiological studies." Brock v. Merrell Dow Pharma., Inc., 874 F.2d 307, 311 (5th Cir. 1989).  The entry of summary judgment is thus appropriate. Maurer v. Meyer-Schulte Corp., 2002 WL 31819160 (E.D. La. 2002) (granting summary judgment where no evidence of causal link between polyurethane foam-coated breast implants and cancer).

- 14 -

1072188-1

**C.   Plaintiff's Medical History Illustrates Other Potential Causes of Her Optic Neuritis**

Not only is there an absence of evidence that Enbrel® caused Plaintiff's optic neuritis, the undisputed evidence shows two possible causes of her condition, which are entirely unrelated to Enbrel®.  The influenza vaccination is commonly associated with the development of optic neuritis. See Miller Decl. at ¶¶ 12, 15 (Ex. 10); Sacks Depo. Trans. at 20:20-21:1 (Ex. 8).  There are reports in the medical literature of patients developing optic neuritis three to four weeks after receiving the influenza vaccination, which is the precise time frame of the onset of Plaintiff's condition after she received the vaccination. See Miller Decl. at ¶¶ 12, 15 (Ex. 10); Sacks Depo. Trans. at 24:1-8 (Ex. 8).  The influenza vaccine is thus a potential cause of Plaintiff's optic neuritis, which cannot be excluded.  Plaintiff also suffers from diabetes – a condition that increases one's risk to develop both anterior and retrobulbar optic neuropathy. See Miller Decl. at ¶ 13 (Ex. 10).  Plaintiff, therefore, cannot establish that Enbrel® is the "most probable cause" of her optic neuritis, entitling the Immunex Defendants to judgment as a matter of law. Wheat v. Pfizer, Inc., 31 F.3d 340, 342 (5th Cir. 1994).[8]

---

[8]   It is not clear from the Petition whether Plaintiff is actually asserting claims for unreasonably dangerous in design (La. Rev. Stat. § 9:2800.56) or unreasonably dangerous in construction or composition (La. Rev. Stat. § 9:2800.55) because the Petition does not allege specific facts to support either theory.  What is clear, however, is that Plaintiff has not, and cannot, come forward with any evidence whatsoever that could support either theory.  The undisputed evidence produced here by the Immunex Defendants demonstrates that no such claims exist for two reasons.  First, according to Dr. Boh's testimony, Enbrel® worked precisely as intended with respect to the indications for which it was prescribed to Pompey. See Boh Depo. Trans. at 30:19-20 (Ex. 1).  Second, she also testified that Enbrel® is highly useful and effective for the indications for which it has been approved had has "a very good safety profile when compared to therapies such as methotrexate, especially long-term therapy." Id. at 16:17-17:12.

**II.**    **The Immunex Defendants Are Entitled to Summary Judgment Because The Learned-Intermediary Doctrine Bars All of Plaintiff's Claims**

Plaintiff has similarly failed to proffer evidence to satisfy the elements of a cause of action for failure to issue an adequate warning. La. Rev. Stat. § 9:2800.57 provides, in part:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

La. Rev. Stat. § 9:2800.57(A).   Under Louisiana law, "a manufacturer of medical drugs and devices has no duty to warn the consumer directly of any risks of contraindications associated with its product." McCarthy v. Danek Med., Inc., 65 F.Supp.2d 410, 413 (E.D. La. 1999) (citing Mikell v. Hoffman-La Roche, Inc., 649 So.2d 75, 80 (La. App. 1994)).   A manufacturer satisfies this obligation:

> [W]hen the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient.  The doctor acts as an informed intermediary, and the decision to use the drug in a particular circumstance rests with the doctor and the patient, not the manufacturer.

Id.   A manufacturer of a prescription product discharges its duty to warn by providing an adequate warning regarding the product's risks to the learned intermediary – usually the prescribing physician – not the ultimate consumer.  See Stahl v. Novartis Pharms. Corp., 283 F.3d 254, 265 (5th Cir.), cert. denied, 123 S. Ct. 111 (2002).

Where, as here, the learned intermediary applies, a two-prong test governs.  Id. at 265-66 (citation omitted).  "First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.  Second, the plaintiff must show that this failure to warn the physician

- 16 -

was both a cause in fact and the proximate cause of the plaintiff's injury." Id. (citation omitted). In other words, a plaintiff must allege "that a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product." Willet v. Baxter Int'l, Inc., 929 F.2d 1094, 1099 (5th Cir. 1991). Put simply, Plaintiff cannot sustain either burden here.

With respect to the first factor – namely proof that the defendant failed to warn (or inadequately warned) the physician of risks associated with the product that was not otherwise known to the physician – the evidence shows clearly that the warning for optic neuritis that accompanied Enbrel® was adequate as a matter of law. "[A] warning regarding a particular adverse drug reaction is adequate as a matter of law if the package insert clearly and unambiguously mentions the specific ailment suffered by the plaintiff *AND* the plaintiff's prescribing physician *unequivocally* testifies that the information provided in the warning was adequate to provide the physician with a reasonable understanding of the risks involved." Stahl, 283 F.3d at 267 (citations omitted) (emphasis in original). As detailed below, according to Dr. Boh, Enbrel®'s warning at the time she prescribed it to Plaintiff clearly warned Dr. Boh that optic neuritis was a potential adverse reaction associated with the biologic.

The "Warnings" section of the package insert in effect at the time of Plaintiff's September 21, 2001 Enbrel® prescription clearly advised physicians of the possible association between Enbrel® and rare cases of demyelinating disorders such as optic neuritis – the very condition complained of in this case. It provides, in pertinent part, that "**[c]ases of transverse myelitis, optic neuritis, and new onset or exacerbation of seizure disorders have been observed in association with ENBREL therapy. The causal relationship to ENBREL therapy remains unclear.**" Package Insert at 11-12 (Ex. 7) (emphasis added)

- 17 -

Equally important is Dr. Boh's unequivocal testimony that this warning language adequately informed her of the potential risk of optic neuritis:

> Q:  Okay. And do you feel that you as a prescribing physician in September of 2001 had the information you needed with respect to the potential adverse reaction for Enbrel to make an informed decision as to whether to prescribe Enbrel® to Ms. Pompey?
>
> A:  Yes.
>
> Q:  And do you believe that the warnings for neurologic events outlined in the package insert which has been marked as Exhibit #6 clearly and unambiguously conveys to you the information available at that time relating to those events?
>
>     *     *     *
>
> A:  Yes, I think it was adequate.

Boh Depo. Trans. at 28:13-29:5 (Ex. 1).[9]  The clear warning, coupled with this testimony, plainly shows that "the language in the package insert was worded strongly enough to adequately inform" Dr. Boh of the risk of optic neuritis, rendering it adequate as a matter of law. See Stahl, 283 F.3d at 267.  Accordingly, summary judgment should be entered.

While the learned intermediary analysis need not go any further because Enbrel®'s warning for optic neuritis was adequate as a matter of law, Plaintiff faces similar hurdles with respect to the second element, which requires a showing "that a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product." Willet v. Baxter Int'l, Inc., 929 F.2d 1094, 1099 (5th Cir. 1991).  Dr. Boh testified that notwithstanding her knowledge of the potential risk of optic neuritis, she made the decision to prescribe Enbrel® to Plaintiff. See Boh Depo. Trans. at 22:17-23:23.  Dr. Boh prescribed Enbrel® because "she

---

[9]  Dr. Boh further testified that she learned about Enbrel® efficacy and safety profile "through workshops, through meetings, and through other colleagues." Boh Depo. Trans. at 13:22-14:1 (Ex. 1).  As such, the package insert certainly was not the only source of information through which Dr. Boh learned about the biologic, including the potential adverse reactions associated with it.

- 18 -

1072188-1

[plaintiff] had been treated with several other therapies," "her arthritis was very symptomatic," studies demonstrated that Enbrel® was "useful and efficacious in rheumatoid arthritis," which is similar to psoriatic arthritis. Id. For these reasons, Dr. Boh "thought this would be a reasonable option to try in a patient who had failed to respond to other therapies." Id.

And, even knowing Plaintiff's outcome, Dr. Boh still would have prescribed it:

> Q:   So knowing Ms. Pompey's outcome, do you still believe it was the appropriate medical decision in September of 2001 to prescribe Enbrel to Ms. Pompey for her arthritis and psoriasis?
>
> A:   I think it was an appropriate choice of medication.  Adverse events happen with all medicines, over-the-counter, as well as prescription, and I still contend that it's a very useful drug for patients.

Boh Depo. Trans. at 48:2-10 (Ex. 1).  In fact, Dr. Boh continues to prescribe Enbrel® to patients with psoriasis and psoriatic arthritis today and has prescribed it to at least "several hundred patients." Id. at 47:16-21; 15:7-12.[10]  Her testimony makes it "clear that no reasonable trier of fact could find that a [different] warning would have changed the decision of the treating physician.'" Willett, 929 F.2d at 1098-99.  Because the learned intermediary doctrine bars Plaintiff's failure to warn claim, summary judgment is appropriate.[11]

---

[10]  Dr. Boh also testified that she has not had any other patient develop optic neuritis while on Enbrel® therapy. See Boh Depo. Trans. at 47:22-48:1 (Ex. 1).

[11]  The Court's Order on the Motion to Dismiss suggests that Plaintiff alleged facts sufficient to sustain a failure to warn claim based upon her allegations that "Defendants marketed the product 'off-label' for treatment of psoriasis without FDA approval, and the medication was prescribed for Plaintiff before FDA approval." MTD Order at 4.  However, Dr. Boh testified that the Immunex Defendants did not promote the off-label use of Enbrel® to her. See Boh Depo. Trans. at 51:7-18 (Ex. 1).  Further, contrary to plaintiff's contention that she was prescribed Enbrel® for an "off-label" indication, Dr. Boh testified that she prescribed Enbrel® to Plaintiff because "her arthritis [which was an approved indication] was not responding to the conventional therapies for arthritis." Id. at 69:3-5.

- 19 -

**III.**   **Summary Judgment is Warranted Because Plaintiff's Claims are Preempted**

**A.**   **Preemption Generally**

Summary judgment is also appropriate because federal law preempts plaintiff's claims.[12]  The Supremacy Clause of the Constitution mandates that federal law is "the supreme Law of the Land, . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.C.A. Const. Art. VI, cl.2; <u>Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,</u> 458 U.S. 141, 153 (1982).  A state law—including a state tort verdict—that conflicts with federal law or regulations is thus preempted.  <u>See</u> <u>Geier v. Am. Honda Motor Co.,</u> 529 U.S. 861, 881 (2000) (finding a state tort verdict in conflict with federal law and, therefore, preempted).[13]

Under the doctrine of conflict preemption, a state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," or "where it is impossible for a private party to comply with both state and federal law." <u>Crosby v. Nat'l Foreign Trade Council,</u> 530 U.S. 363, 372-373 (2000); <u>see also</u> <u>Int'l Paper Co. v. Ouellette,</u> 479 U.S. 481, 494 (1987) (state law is preempted when it interferes with the methods by which a federal law is implemented and its purposes realized).[14]  Here, Plaintiff's state-law causes of action conflict with the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 <u>et seq.</u>, and, if permitted, will impede the Act's administration and purpose.

---

[12]  The Court need not and, indeed should not reach a constitutional issue--such as the preemption issue-- if the Court finds, as the Immunex Defendants urge, that Pompey's claims fail for the non-constitutional reasons detailed above.

[13]  Preemption can occur in three situations: (1) when Congress expressly provides that federal law preempts state law, (2) when federal regulation of a legislative field is so comprehensive that it leaves no room for state regulation, and (3) when federal law actually conflicts with state law. <u>See</u> <u>English v. General Elec. Co.,</u> 496 U.S. 72, 78-79, (1990); <u>see also</u> <u>Cipollone v. Liggett Group, Inc.,</u> 505 U.S. 504 (1992).  The third situation is at issue here.

[14]  Thus, Congressional intent to preempt state-law may be "implicitly contained in [an Act's] structure and purpose." <u>Cipollone,</u> 505 U.S. at 516 (quoting <u>Jones v. Rath Packing Co.,</u> 430 U.S. 519, 525 (1977)).

- 20 -

**B.**     **FDA Regulatory Scheme**

The FDCA and related regulations represent a comprehensive regulatory regime for the approval and post-approval monitoring of biological products such as Enbrel®.  FDA is vested with exclusive regulatory authority to approve biological products that are shown to be "safe, pure, and potent," before they may be sold in the United States.  See 21 U.S.C. § 355(a); 42 U.S.C. § 262(a)(2)(B)(i)(I) (charging Secretary of Health and Human Services with regulating approval, labeling, and promotion of biological products sold in the United States); 21 C.F.R. §§ 5.10(a)(1), (a)(3) (HHS delegating authority to FDA).[15]

FDA's regulatory scheme for biological products is extremely rigorous.  To obtain approval to market a biological product, a manufacturer must submit to FDA a detailed biologics license application (BLA) containing substantial amounts of information, including laboratory test results and the results of clinical trials.  See 21 C.F.R. § 601.2.  FDA will approve a BLA only if it finds that the application meets its strict requirements for licensure. See id. § 601.20. Federal oversight does not end once a BLA is approved.  Rather, FDA continues to monitor a biological product's safety.  It requires manufacturers to notify the agency in the event of "adverse experiences."  Id. § 600.80.  Further, FDA must take steps to withdraw the license if, at any time, it finds that "[t]he licensed product is not safe and effective for all of its intended uses or is misbranded with respect to any such use."  Id. § 601.5(b)(1)(vi).

Significantly, FDA regulations also mandate the format and the content of all sections of drug and biological product labeling, and the risk information each section must contain.  Id. §§ 201.56, 201.57; see id. § 201.59 (applying labeling regulations to licensed biological product).  A

---

[15]   Under the FDCA, FDA must "protect the public against danger to human life arising from use of unsafe and ineffective drugs by assuring that before any drug is marketed it will have been carefully reviewed by FDA experts." Premo Pharm. Labs., Inc. v. United States, 629 F.2d 795, 802 (2d Cir. 1980).

1072188-1

biological product is licensed only for the conditions of use stated in FDA-approved labeling, and FDA cannot issue a license for a biologic until the agency concludes that the labeling is adequate.  See 21 C.F.R. § 201.100(d)(1).[16]  A manufacturer may not include statements of precaution, contraindication, or warning on drug labeling without FDA's approval. Id.[17]

And, significantly, in the Preamble to the new "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products," which was issued on January 18, 2006, FDA states clearly that it "believes that under existing preemption principles, FDA approval of labeling under the act [the FDCA], whether it be in the old or new format, preempts conflicting contrary State law." Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3933-34 (Jan. 24, 2006) (Ex. 13). FDA further expresses the agency's opinion that various types of product liability claims would be preempted by FDA's regulation of prescription drug labeling, including claims, such as the one at issue here, that a manufacturer "fail[ed] to include a statement in labeling or in advertising" that "had been proposed to FDA" and that the FDA had "not required. . .at the time" the plaintiff claims the warning should have been given (unless the FDA first determined that material information had been withheld). Id. at 3936.

The views articulated in the Preamble demonstrate that, with respect to product liability litigation such as this case, "the exercise of State authority conflicts with the exercise of Federal

---

[16]  Further, a manufacturer may not introduce a biological product into interstate commerce unless its labeling complies with FDA's requirements.  Id. § 201.59.  Nor can a manufacturer introduce into interstate commerce a biological product with labeling that is false or misleading without the product being deemed "misbranded" by the agency.  See 21 U.S.C. § 352(a).

[17]  In certain narrow circumstances, a manufacturer can change a label prior to receiving FDA approval, see 21 C.F.R. § 314.70(c)(2), but such changes may be made "only temporarily if the [labeling] supplement is not approved by the FDA." Ehlis v. Shire Richwood, Inc., 233 F. Supp. 2d 1189, 1197 (D. N. Dak. 2002), aff'd 367 F.3d 1013 (8th Cir. 2004).

- 22 -

1072188-1

Authority" under the FDCA. Id. at 3967.  FDA instructs that "the determination of whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the Act." Id. at 3934.  Because FDA has the exclusive authority to regulate the labeling of biologic products, such as Enbrel®, "[i]f State authorities, including judges and juries applying State law, were permitted to reach conclusions about the safety and effectiveness information disseminated with respect to drugs for which FDA has already made a series of regulatory determinations based on its considerable institutional expertise and comprehensive statutory authority, the federal system for regulation of drugs would be disrupted." Id. at 3969.[18]

## C.    FDA Mandated the Demyelination Warning Language for Enbrel®

Enbrel® clearly satisfied all of the agency's standards for approval, and continues to do so during the post-marketing period.  With respect to the demyelination warnings in the Enbrel® package insert, FDA has worked closely with the Immunex Defendants to review available evidence of rare post-marketing reports of demyelinating disorders and to determine exactly what language should be in the warnings.

### 1.    Enbrel®'s Package Insert

Specifically, shortly after receiving those rare reports, Immunex and Wyeth representatives participated in a conference call with FDA to discuss the reported instances of demyelination.  See Immunex Telephone Contact Report (May 18, 2000) (Ex. 14).  In early June 2000, Immunex and Wyeth proposed changes to the package insert for Enbrel® and submitted its proposed changes to FDA for the agency's review.  See Immunex Telephone Contact Report (June 8, 2000) (Ex. 15).  In August 2000, Immunex and Wyeth updated Enbrel®'s package

---

[18]    These comments from FDA constitute advisory opinions pursuant to 21 C.F.R. § 10.85(d)(1), which provides that any portion of "a preamble to a proposed or final regulation" is an advisory opinion.

insert. The update added a precaution on neurological events to describe rare cases of central nervous system demyelinating diseases, which advised doctors to perform a careful risk/benefit analysis in patients with preexisting or recent onset of such disorders before prescribing Enbrel®. 2001 Briefing Document at 10 (Ex. 5). And, FDA specifically approved the final language of this precaution. See FDA Approval Letter (Ex. 16).

### 2.     "Dear Doctor" Letter

In October 2000, Immunex and Wyeth issued a "Dear Doctor" letter notifying practitioners of these adverse events and labeling changes, and of other rare adverse events and changes to Enbrel®'s labeling. See "Dear Doctor" Letter (Ex. 6). Yet, before Immunex and Wyeth issued the "Dear Doctor" letter regarding demyelination, they engaged in detailed consultations with FDA about the contents and wording of the letter, just as they had (and were required to) regarding the changes to Enbrel®'s package insert, and just as they previously had when updating the package insert to include warnings relating to infections. See, e.g., Immunex Telephone Contact Report Re: CBE/Dear Doctor Letter (Sept. 22, 2000) (Ex. 17); Immunex Telephone Contact Report Re: Revised Enbrel Labeling (Sept. 22, 2000) (Ex. 18).[19] On October 3, 2000, representatives from Immunex, Wyeth, and FDA discussed "FDA's comments on Immunex's proposed 'Dear Doctor' letter and revised Enbrel® package insert." Immunex Telephone Contact Report Re: Discussion of the "Dear Doctor" letter and revised ENBREL® Package Insert 1 (Oct. 3, 2000) (Ex. 19). The agency, Immunex, and Wyeth discussed in detail the proposed wording of the "Dear Doctor" letter. See id. at 1 (noting proposed edits to first

---

[19]     During the September 22, 2000, call regarding the Dear Doctor letter, an Immunex representative asked Dr. Jeffrey Siegel of CBER whether the "Dear Doctor" letter could issue without agency approval. Immunex Telephone Contact Report Re: CBE/Dear Doctor Letter at 1. Dr. Siegel stated that he had conferred with another CBER doctor and that person "strongly urged that [Immunex and Wyeth] not send anything out without CBER agreement." See Telephone Contact Report (Ex. 17).

- 24 -

sentence in second paragraph of draft letter); id. at 2 (discussing changes to second sentence in second paragraph of draft letter); see also id. at 2 (discussing agency's proposed changes to Enbrel® package insert). For example, the agency proposed, and the companies agreed, to move the references to demyelination in the package insert from the "Precautions" section of the insert to the "Warnings" section. Id. The precise language of the "Dear Doctor" letter and package insert relating to neurological events was, thus, mandated by FDA.

Subsequently, on August 17, 2001, the FDA's Arthritis Advisory Committee met to discuss postmarket safety issues related to Enbrel® and another rheumatoid arthritis biological product, Remicade. See Excerpts from Arthritis Advisory Committee Transcript (Aug. 17, 2001) (Ex. 20). Immunex included in its safety summary information regarding the history of demyelinating events associated with Enbrel®. Immunex identified one definitively diagnosed case of multiple sclerosis, four probable cases, and up to seven expected cases, as well as eight relapses of patients with preexisting MS. Id. at 92. Immunex's expert advisory panel concluded that the causal relationship between the drug and the events was uncertain. Id. at 93. Despite the uncertainty of a causal relationship, however, the Enbrel® package insert has contained a warning for demyelinating events since October 10, 2000 and carried such a warning when Ms. Pompey was prescribed the biologic on September 21, 2001. See Package Insert (Ex. 7).

## D.    Plaintiff's Claims are Preempted

Plaintiff's failure to warn claim impermissibly calls into question FDA's detailed approval and regulatory oversight of Enbrel®, and strikes at the very heart of the agency's regulatory responsibilities. FDA's role in approving the additional Enbrel® warnings was far from passive. To the contrary: the agency worked closely with Immunex and Wyeth to review available evidence of post-marketing reports of adverse events, and to determine exactly what

- 25 -

language should be included in the biological product's updated package insert and in the "Dear Doctor" letters sent to health care providers. Plaintiff, however, claims that the warnings are not adequate, despite FDA's approval. If a jury agrees with her, it will necessarily <u>disagree</u> with FDA—and thus a jury's lay opinion will supplant the expert opinion of the agency charged with determining the appropriate warning language for Enbrel®. See <u>Premo Pharm. Lab., Inc. v. United States</u>, 629 F.2d 629, 803 (2nd Cir. 1980) (noting that "[t]he entire statutory scheme envisages that the FDA will perform the difficult task of investigation and scientific evaluation usually required to determine whether a drug product is safe and effective"). Plaintiff's claims are thus conflict-preempted because they usurp FDA's exclusive authority over – and FDA's expert assessment of – the appropriate labeling of Enbrel®.

Fifth Circuit precedent supports the conclusion that Plaintiff's failure to warn claims are preempted. In <u>Hurley v. Lederle Labs.</u>, 863 F.2d 1173, 1179-80 (5th Cir. 1988), the plaintiff brought state-law tort claims that, among other things, challenged the adequacy of a vaccine warning. In remanding the case to the district court to further consider issues relating to the adequacy of the warning, the Court of Appeals observed that a warning "approved and required" by FDA would likely be preempted.[20] As the Court explained, FDA "extensively regulates the contents and wording" of package inserts. <u>Id.</u> at 1179. Manufacturers provide all relevant information to FDA, which in turn determines what warning is appropriate for the biologic's labeling; manufacturers are "required to print that precise warning in its product insert" and may not change the language of that warning without the agency's approval. <u>Id.</u> Where "FDA has

---

[20] The <u>Hurley</u> court found no Congressional intent to <u>completely</u> preempt the <u>field</u> of state tort claims relating to vaccines. <u>Id.</u> at 1177-78. The court of appeals acknowledged, however, that "[e]ven where Congress has not completely displaced state regulation," specific state laws would be preempted where they conflicted with federal objectives. <u>Id.</u> at 1177 n.3.

- 26 -

processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state." Id.

More recently, the Southern and Northern Districts of Texas have found that state law claims premised on the assertion that the prescription drug Zoloft should have included additional warnings regarding the risk of suicide were preempted. See Needleman v. Pfizer Inc., No. Civ. A. 3:03-CV-3074-N, 2004 WL 1773697 at *5-6 (N.D. Tex. Aug. 6, 2004) (granting summary judgment on the ground that the plaintiffs' failure to warn claims were preempted by the FDA's rulings and the FDCA's labeling requirements); Dusek v. Pfizer Inc., No. Civ. A. H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb 20, 2004) (same).  In both cases, the courts noted the extensive communications between the drug manufacturer and FDA regarding the wording of suicide warnings in finding the plaintiffs' claims were preempted. See Needleman, 2004 WL 1773697 at *1-2; Dusek, 2004 WL 2191804 at *6-7.[21]

It is difficult to imagine a stronger case for preemption than this one.  A jury verdict finding defendants liable for "failure to warn" when FDA has expressly approved both the product's warnings and has declared the product safe and effective, would directly contravene

_____

[21]   Although there has been a split among courts addressing this issue, other jurisdictions have come to the same conclusion.  See R.F. v. Abbott Labs., 745 A.2d 1174, 1189, 1191 n. 18 (N.J. 2000) (discussing FDA's "extensive control and pre-licensure and post-licensure scrutiny of the Test" and observing that FDA had "not only scrutinize[d] the language required in the [test's] package insert, but also in large part, dictated the wording of the insert."); see also Ehlis v. Shire Richwood, 233 F. Supp. 2d 1189, 1198 (N.D. 2002) ("FDA dictates the contents of the label for Adderal® and defendants were prohibited from changing it without prior approval from the FDA"); Colacicco v. Apotex, Inc., 432 F.Supp.2d 514 (E.D. Pa. 2006) (finding that FDA approval process for generic drug impliedly preempted plaintiff's failure to warn claims); Abramowitz v. Cephalon, Inc., 2006 WL 560639, *4 (N.J. Super. L. Mar. 3, 2006) (ruling that failure to warn claim was preempted by FDA approval process for prescription drug labels); In re: Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig., No. 05-1699 CRB, slip op. at 6-15 (N.D. Cal. Aug. 16, 2006) (finding that failure to warn claims relating to cardiovascular risks of drug are preempted based upon FDA's determination that such a warning is not substantiated by scientific evidence).  A copy of this opinion is attached hereto for the Court's convenience.  And, no Circuit Court has addressed the preemption issue since FDA issued its recent preemption comments in the Preamble.

- 27 -

as Attachment A

the expert view of the agency. Thus, Plaintiff's claims are preempted, and summary judgment is appropriate.[22]

## CONCLUSION

For the reasons set forth above, Defendants Amgen Inc. and Immunex Corporation respectfully request that their Motion for Summary Judgment be granted and that summary judgment be entered in their favor on all counts of the Plaintiff's Petition.

Respectfully submitted,

By: _____

G. William Jarman (Bar Roll No. 7238)
Glenn M. Farnet (Bar Roll No. 20185)
KEAN, MILLER, HAWTHORNE,
D'ARMOND McCOWAN & JARMAN,
L.L.P.
One American Place, 22nd Floor
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70825
Telephone:  (225) 387-0999
Fax:  (225) 388-9133

Of Counsel:

Lauren S. Colton (admitted *pro hac vice*)
Hogan & Hartson L.L.P.
111 South Calvert Street
Baltimore, MD  21202
(410) 659-2700

---

[22]   In the unlikely event that Plaintiff provides evidence of a design defect, the preemption analysis still applies as the Fifth Circuit has suggested that design defects may be preempted as well. Hurley v. Lederle Labs., 863 F.2d 1173, 1179-80 (5th Cir. 1988).

- 28 -

1072188-1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served on all counsel of record by depositing same in the United States Mail, properly addressed and postage prepaid, this 10th day of August, 2006.

_____
Glenn M. Farnet

- 29 -